The NORTH AMERICAN COAL CORPO-RATION, Plaintiff and Appellant,

v.

Mark HUBER, a minor over the age of fourteen years, and Donald T. Huber, natural father and guardian ad litem of Mark Huber, Defendants and Appellees.

Civ. No. 9486.

Supreme Court of North Dakota.

July 26, 1978.

Rehearing Denied Aug. 16, 1978.

Fleck, Mather, Strutz & Mayer, Bismarck, for plaintiff and appellant; argued by Gary R. Wolberg, Bismarck.

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for defendants and appellees; argued by Irvin B. Nodland, Bismarck.

PEDERSON, Justice.

This appeal by North American Coal Corporation requires this Court, for the first time, to interpret the "Surface Owner Protection Act," Chapter 38–18, NDCC (Chapter 321, S.L.1975). The trial court concluded, as a matter of law, that the Act only applied where the mineral developer

"has *all* right, title and interest either by leasehold or outright ownership to *all* of the * * * minerals." [Emphasis added.] We agree. The question of constitutionality of the Act was not reached below and we do not directly reach it here.

There are no disputes as to pertinent facts. The parties stipulated the facts, and there is no challenge of any finding of fact (Rule 52(a), NDRCivP). There was no stipulation that there was any expectation of strip mining when the life estate and remainder interests were created. The lands involved (E–½—35—144—89) abut the Indian Head Mine now operated in Mercer County by North American. We agreed to expedite the calendaring of this appeal in order to accommodate some critical planning required for the continuation of the mining operation.

The ownership of the land (surface) and the underlying minerals (coal) have been both fragmentized and, in part, severed. A life estate in the surface is owned by Anna Fuchs and the remainder interest in the surface is fragmented among twelve persons, including Mark Huber, a minor, who owns a ⅟₆₄th remainderman interest. Twenty-five percent of the coal is owned by Kurt Krauth and Helen C. Weyrens. Anna Fuchs owns a life estate in 75% of the coal and the remainder interest in 75% of the coal is fragmented among the same twelve persons who have remaindermen interests in the surface. Mark Huber has a vested remainderman interest in ⅟₆₄th of 75% of the coal.

Kurt Krauth, Helen C. Weyrens and Anna Fuchs leased their interests in coal to North American Coal Corporation. All remaindermen, except Mark Huber, ratified the leases as to both the surface and the coal. Contending that the Public Service Commission can issue a permit to use the surface for mining operations without the consent of surface owners and without the developer having acquired *all* of the mineral interests, North American sought an order of the district court, pursuant to § 38–18–06(5), NDCC. In declining to grant the relief demanded by North American, the trial court likened these efforts to those of private condemnation and noted that partition (Chapter 32–16, NDCC) would be a more appropriate proceeding.

In interpreting statutes, we are guided by a number of rules:

"Words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears, but any words explained in this code are to be understood as thus explained." Section 1–02–02, NDCC.

"Words and phrases shall be construed according to the context and the rules of grammar and the approved usage of the language. Technical words and phrases and such others as have acquired a peculiar and appropriate meaning in law, or as are defined by statute, shall be construed according to such peculiar and appropriate meaning or definition." Section 1–02–03, NDCC.

"When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Section 1–02–05, NDCC.

"In enacting a statute, it is presumed that:

1. Compliance with the constitutions of the state and of the United States is intended.

2. The entire statute is intended to be effective.

3. A just and reasonable result is intended.

4. A result feasible of execution is intended.

5. Public interest is favored over any private interest."

Section 1–02–38, NDCC.

"If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:

1. The object sought to be attained.

2. The circumstances under which the statute was enacted.

3. The legislative history.

4. The common law or former statutory provisions, including laws upon the same or similar subjects.

5. The consequences of a particular construction.

6. The administrative construction of the statute.

7. The preamble."

Section 1–02–39, NDCC.

The "Surface Owner Protection Act" resulted from an interim study by the Legislative Council Committee on Resources Development prior to the Forty-Fourth Legislative Assembly, 1975. Participating in that study was the Executive Branch Advisory Committee Task Force on Coal Gasification. The Act was introduced as House Bill No. 1062 and, after passage, became Chapter 321, Session Laws 1975, and thereafter was codified as Chapter 38–18, NDCC.

The title of the Act provided that it was "to require written notice and approval before a permit to surface mine land is issued by the public service commission, to provide for surface damage and disruption payments, and to provide for a financial obligation to reclaim land disturbed by a mining operation."

We note that Section 61 of the Constitution of the State of North Dakota provides: "No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed." Thus, we are limited in our interpretation of the Act to those subjects expressed in the title. If it is possible to do so, we avoid interpretations of statutes which place the statute in disharmony with our Constitution. See *Hjelle v. Sornsin Construction Company*, 173 N.W.2d 431, 438 (N.D.1970), and cases cited therein.

The purpose of the "Surface Owner Protection Act" is expressed specifically in "Legislative Findings" (§ 38–18–02), in terms such as "it is necessary to . . . protect . . . agriculture . . . ," and " . . . mining development may temporarily interfere with portions of the agricultural economy." Further purposes and guides for interpretation are stated in § 38–18–03, NDCC, which provides:

"It is the purpose of this chapter to provide the maximum amount of constitutionally permissible protection to surface owners from the undesirable effects of development, without their consent, of minerals underlying their surface. This chapter is to be interpreted in light of the legislative intent expressed herein. The provisions of this chapter shall be interpreted to benefit surface owners, regardless of how the mineral estate was *separated* from the surface estate and regardless of who executed the document which gave the mineral developer the right to conduct mining operations on the land." [Emphasis added.]

Section 38–14–03, NDCC, first enacted in 1969 (§ 3, Ch. 332, S.L.1969), prohibits surface mining of coal without a permit from the Public Service Commission (PSC). Most of the terms, conditions and limitations involved in the issuance of a surface mining permit are described in Chapter 38–14, NDCC, relating to the reclamation of strip-mined lands. Section 38–18–06, NDCC, imposes additional conditions and requirements, primarily for the benefit of agriculture and for a surface owner who does not own the underlying minerals.

The power of a district court to issue an order authorizing the PSC to issue a permit without the consent of the surface owner is described in § 38–18–06(5), NDCC, as follows:

"If the mineral owner or the mineral developer is unable to obtain the surface owner's consent, the mineral owner or mineral developer may bring an action in district court to establish the relative rights of the parties and the measure of damages to the surface owner. At any time after the filing of any such action and either before or after the final decision of the district court, upon a showing to the satisfaction of the court that the surface owner will be adequately compensated for lost production, lost land value, and loss of the value of improvements due to the mining activity, the court shall issue an order which will authorize the public service commission to issue a per-

mit to surface mine land without the consent which would otherwise be required by this section. In the event the damages awarded by the court to the surface owner exceed the amount tendered or otherwise provided for, the court shall award to the surface owner reasonable attorney's fees in addition to any other sums determined to be due to him."

We were advised during oral argument that only Montana has enacted a similar surface owner protection statute. Our search discloses that the Montana Legislature, in 1975, adopted Section 50–1039.1 as a part of Montana's Strip and Underground Mine Reclamation Act, as follows:

"Protection of the surface owner. In those instances in which the surface owner is not the owner of the mineral estate proposed to be mined by strip mining operations, the application for a permit shall include the written consent, or a waiver by, the owner or owners of the surface lands involved to enter and commence strip mining operations on such land, except that nothing in this section applies when the mineral estate is owned by the federal government in fee or in trust for an Indian tribe." § 50–1039.1, R.C.M., 1977 Cum.Supp.

The distinguishing feature is obvious when the North Dakota and Montana statutes are compared. There is no apparent exception to a requirement of surface-owner consent in Montana. We have not been able to determine that the Montana Supreme Court has had occasion to interpret § 50–1039.1.

A "mineral developer" is defined in § 38–18–05(4) as "the person who acquires *the mineral rights* or lease for the purpose of extracting or using the mineral for nonagricultural purposes." [Emphasis added.] A "mineral owner," on the other hand, is defined in § 38–18–05(7) as "any person who owns *the mineral estate* under a specified tract of land *by means of a mineral deed* . . . ." [Emphasis added.] One who acquires a mineral interest by a mineral lease does not qualify as a "mineral owner" under these definitions. According-

ly, North American can be a "mineral developer" but cannot be a "mineral owner," and Mark Huber is the only "mineral owner" involved in this suit.

The question we must decide is whether North American is, in fact, entitled to be classified as a "mineral developer" in this case for, if it is, it would appear that it would be entitled to an order, under § 38–18–06(5), NDCC, in view of the absence of the consent from all surface owners. When we apply the afore-quoted rules of interpretation, we reach the conclusion that, in order to be considered a "mineral developer," North American would, as a prerequisite, have to acquire "the mineral rights," not just a "mineral estate."

A "mineral estate" is defined in § 38–18–05(5) as "an estate in or ownership of *all or part of* the minerals under a specified tract of land." [Emphasis added.] If the Legislature had intended to permit a person to proceed as a mineral developer with only a *part of the minerals,* it would have defined a mineral developer as one who acquired a "mineral interest" and not one who acquired "the mineral rights."

We would reach the same conclusion by examining the laws upon a similar subject (oil and gas), and the legislative history as reflected in the minutes of the Legislative Council. If the Legislature had intended, in this Act, to accomplish, in effect, a forced pooling of the mineral interests, it could have used language such as it used in Chapter 38–08, NDCC, relating to oil and gas interests. The minutes show that the idea of forced pooling was discussed and, when a representative of the Attorney General's office expressed doubt as to the validity of forced pooling for coal mining, the matter was apparently not further considered. North American has raised some objection to our consideration of these matters because they were not presented to the trial court. Section 1–02–39(3), NDCC, specifically authorizes the consideration of legislative history when a statute appears to be ambiguous. If counsel for Huber had not pointed it out to us, we would have

searched for it as a routine part of our consideration of the case.

We conclude that an action under § 38-18-06(5), NDCC, is applicable only where there is a clear conflict between the entire mineral interest and severed surface interests. The Surface Owner Protection Act obviously was not intended to provide a forum for determining the extent that mineral interests may, under all circumstances, dominate surface interests, for settling disputes between remaindermen and life tenants, nor for establishing the applicability to remaindermen disputes of rules of cotenancy. The case was properly dismissed and we affirm that judgment. We express no opinion as to the correctness of the trial court's suggestion that an action for partition of real property under Chapter 32-16, NDCC, is available.

ERICKSTAD, C. J., and PAULSON, SAND and VOGEL, JJ., concur.