# THREE AFFILIATED TRIBES OF THE FORT BERTHOLD RESERVATION v. WOLD ENGINEERING, P. C., ET AL.

No. 82–629.   Argued November 29, 1983—Decided May 29, 1984

140

*Raymond Cross* argued the cause for petitioner. With him on the briefs was *John O. Holm.*

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Habicht,* and *Edwin S. Kneedler.*

*Hugh McCutcheon* argued the cause for respondents and filed a brief for respondent Wold Engineering, P. C.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This litigation presents issues of state-court civil jurisdiction over a claim asserted by an Indian tribe. The case, as it comes to us, is somewhat unusual in a central respect: the Tribe seeks, rather than contests, state-court jurisdiction, and the non-Indian party is in opposition. Cf. *Williams* v. *Lee,* 358 U. S. 217 (1959).

Chapter 27–19 of the North Dakota Century Code (1974) is entitled "Indian Civil Jurisdiction." Section 27–19–01 of that

---

*Briefs of *amici curiae* urging reversal were filed for the Standing Rock Sioux Tribe et al. by *Reid Peyton Chambers;* and for the Turtle Mountain Band of Chippewa Indians by *Kim Jerome Gottschalk* and *Richard B. Collins.*

Code provides that the jurisdiction of North Dakota courts shall extend "over all civil causes of action which arise on an Indian reservation upon acceptance by Indian citizens." In this case, the Supreme Court of North Dakota interpreted Chapter 27–19 to disclaim state-court jurisdiction over a claim (against a non-Indian) by an Indian Tribe that had not accepted jurisdiction under the statute. The court determined that the North Dakota Legislature had disclaimed jurisdiction pursuant to the principal federal statute governing state jurisdiction over Indian country, namely, the Act of Aug. 15, 1953, 67 Stat. 588, as amended, 28 U. S. C. § 1360, commonly known as Pub. L. 280. The court further concluded that the jurisdictional disclaimer, inasmuch as it was authorized by Pub. L. 280, did not run afoul of the North Dakota or Federal Constitutions. Because the North Dakota Supreme Court's interpretation of Chapter 27–19 and its accompanying constitutional analysis appear to us to rest on a possible misunderstanding of Pub. L. 280, we vacate the court's judgment and remand the case to allow reconsideration of the jurisdictional questions in the light of what we feel is the proper meaning of the federal statute.

I

A. Petitioner Three Affiliated Tribes of the Fort Berthold Reservation is a federally recognized Indian Tribe with its reservation in northwestern North Dakota. Act of Mar. 3, 1891, ch. 543, § 23, 26 Stat. 1032. See *City of New Town* v. *United States,* 454 F. 2d 121 (CA8 1972). In 1974, petitioner employed respondent Wold Engineering, P. C. (hereafter respondent), a North Dakota corporation, to design and build the Four Bears Water System Project, a water-supply system located wholly within the reservation. The project was completed in 1977 but it did not perform to petitioner's satisfaction.

In 1980, petitioner sued respondent in a North Dakota state court for negligence and breach of contract. At the time the suit was filed, petitioner's tribal court did not have

jurisdiction over a claim by an Indian against a non-Indian in the absence of an agreement by the parties. Tribal Code, ch. II, § 1(a).[1] The subject matter of petitioner's complaint, however, clearly fell within the scope of the state trial court's general jurisdiction. See N. D. Const., Art. VI, § 8; N. D. Cent. Code § 27–05–06 (1974 and Supp. 1983). After counterclaiming for petitioner's alleged failure to complete its payments on the water-supply system, respondent moved to dismiss petitioner's complaint on the ground that the trial court lacked subject-matter jurisdiction over any claim arising in Indian country.

B. At this point, in order to place respondent's jurisdictional argument in perspective, it is desirable to review the somewhat erratic course of federal and state law governing North Dakota's jurisdiction over the State's Indian reservations. Long before North Dakota became a State, this Court had recognized the general principle that Indian territories were beyond the legislative and judicial jurisdiction of state governments. *Worcester* v. *Georgia*, 6 Pet. 515 (1832); see generally *Williams* v. *Lee*, 358 U. S., at 218–222. That principle was reflected in the federal statute that granted statehood to North Dakota. Like many other other States in the Midwest and West,[2] North Dakota was required to "disclaim all right and title . . . to all lands lying within [the State] owned or held by any Indian or Indian tribes" as a condition for admission to the Union. Enabling Act of Feb. 22, 1889, § 4, cl. 2, 25 Stat. 677. The Act further provided that all such Indian land shall "remain subject to the disposition of the United States, and . . . shall remain under the absolute jurisdiction and control of the Congress of the United

---

[1] Following the North Dakota Supreme Court's decision in this case, petitioner's Tribal Business Council amended the Tribal Code to grant the tribal court subject-matter jurisdiction over all civil causes of action arising within the boundaries of the Fort Berthold Reservation.

[2] See F. Cohen, Handbook of Federal Indian Law 268, and n. 72 (1982 ed.).

States." *Ibid.* North Dakota's original Constitution contained, in identical terms, the required jurisdictional disclaimers. See N. D. Const., Art. XVI, § 203, cl. 2 (1889).

Federal restrictions on North Dakota's jurisdiction over Indian country, however, were substantially eliminated in 1953 with the enactment of the aforementioned Pub. L. 280. See generally *Washington* v. *Yakima Indian Nation,* 439 U. S. 463, 471–474 (1979).[3] Sections 2 and 4 of Pub. L. 280 gave five States full jurisdiction, with a stated minor exception as to each of two States, over civil and criminal actions involving Indians and arising in Indian country. 67 Stat. 588–589, codified, as amended, at 18 U. S. C. § 1162 and 28 U. S. C. § 1360, respectively. Sections 6 and 7 gave all other States the option of assuming similar jurisdiction. Section 6 authorized States whose constitutions and statutes contained federally imposed jurisdictional restraints, like North Dakota's, to amend their laws to assume jurisdiction. 67 Stat. 590, codified, as amended, at 25 U. S. C. § 1324. Section 7 provided similar federal consent to any other State not having civil and criminal jurisdiction, but required such States to assume jurisdiction through "affirmative legislative action." 67 Stat. 590. As originally enacted, Pub. L. 280 did not require States to obtain the consent of affected Indian tribes before assuming jurisdiction over them. Title IV of the Civil Rights Act of 1968 amended Pub. L. 280, however, to require that all subsequent assertions of jurisdiction be preceded by tribal consent. Pub. L. 90–284, §§ 401, 402, 406, 82 Stat. 78–80, codified at 25 U. S. C. §§ 1321, 1322, 1326.

Even before North Dakota moved to amend its Constitution and assume full jurisdiction under Pub. L. 280, the North Dakota Supreme Court had taken an *expansive* view of the scope of state-court jurisdiction over Indians in Indian

---

[3] Before that, however, Congress had vested North Dakota with certain criminal jurisdiction over the Devils Lake Reservation. Act of May 31, 1946, ch. 279, 60 Stat. 229.

country. In 1957, the court held that the existing jurisdictional disclaimers in the Enabling Act and the State's Constitution foreclosed civil jurisdiction over Indian country only in cases involving interests in Indian lands themselves. *Vermillion* v. *Spotted Elk*, 85 N. W. 2d 432. The following year, 1958, North Dakota amended its Constitution to authorize its legislature to "provid[e] for the acceptance of such jurisdiction [over Indian country] as may be delegated to the State by Act of Congress." N. D. Const., Art. XIII, § 1, cl. 2. Finally, in 1963, the North Dakota Legislature enacted Chapter 27–19, the principal section of which provides:

> "In accordance with the provisions of Public Law 280 . . . and [the amended] North Dakota constitution, jurisdiction of the state of North Dakota shall be extended over all civil causes of action which arise on an Indian reservation upon acceptance by Indian citizens in a manner provided by this chapter. Upon acceptance the jurisdiction of the state shall be to the same extent that the state has jurisdiction over other civil causes of action, and those civil laws of this state that are of general application to private property shall have the same force and effect within such Indian reservation or Indian country as they have elsewhere within this state." N. D. Cent. Code § 27–19–01 (1974).

On their face, both the 1958 amendment to the North Dakota Constitution and Chapter 27–19 appear to *expand* preexisting state jurisdiction over Indian country rather than to contract it. In *In re Whiteshield*, 124 N. W. 2d 694 (1963), however, the North Dakota Supreme Court reached the conclusion that Chapter 27–19 actually *disclaimed* all jurisdiction over claims arising in Indian country absent Indian consent. In subsequent decisions, that court adhered to its general view that without Indian consent "the State has no jurisdiction over any civil cause arising on an Indian reservation in this State." *White Eagle* v. *Dorgan*, 209 N. W. 2d 621, 623

(1973).[4]  In each case in which the North Dakota Supreme Court declined to recognize jurisdiction, however, the defendant was an Indian; the court never had held squarely that an Indian could not maintain an action against a non-Indian in state court for a claim arising in Indian country.[5]

C.  Respondent's motion to dismiss rested on the restrictive jurisdictional principles of *Whiteshield* and its successors.  Because the petitioner Tribe at no point has consented to state-court jurisdiction under Chapter 27–19 over the Fort Berthold Reservation, respondent argued that the trial court lacked jurisdiction over petitioner's claim under Chapter 27–19 and the amended provisions of Pub. L. 280.  Petitioner opposed respondent's motion to dismiss on the ground, *inter alia*, that the tribal consent requirements of the Civil Rights Act of 1968 were not meant to apply to a suit brought by a tribal government like petitioner.  The trial court rejected petitioner's arguments and granted the motion to dismiss the suit for lack of jurisdiction, but did so without prejudice to a renewal of the action following compliance with the state and federal consent requirements.  App. to Pet. for Cert. 1a.

On appeal, the North Dakota Supreme Court affirmed. 321 N. W. 2d 510 (1982).  Petitioner argued that the jurisdiction recognized in *Vermillion* had not been extinguished altogether and that the North Dakota courts possessed "residuary jurisdiction" over a claim by an Indian against a non-Indian following the enactment of Pub. L. 280 and the Civil Rights Act of 1968.  The court rejected this argument, adhering instead to its conclusion in *Nelson* v. *Dubois*, 232

---

[4] In *Gourneau* v. *Smith*, 207 N. W. 2d 256, 258 (1973), the court expressly held that *Vermillion* "no longer states the rule to be applied . . . in a case between Indians arising out of use of the public highways on an Indian reservation."

[5] In *United States ex rel. Hall* v. *Hansen*, 303 N. W. 2d 349, 350, and n. 3 (1981), however, the court did state in dictum that a state trial court lacked jurisdiction over a claim by an Indian against a non-Indian arising in Indian country.

N. W. 2d 54 (1975), that any residuary jurisdiction was pre-
empted by the tribal consent requirements contained in the
Civil Rights Act of 1968.  After reviewing the history of
North Dakota's jurisdiction over Indian country, the court
reaffirmed its prior holdings, observing that "we have no
jurisdiction over civil causes of action arising within the
exterior boundaries of an Indian reservation, unless the In-
dian citizens of the reservation vote to accept jurisdiction."
321 N. W. 2d, at 512.

The court also rejected petitioner's argument that to pro-
hibit an Indian plaintiff from suing a non-Indian in state court
for a claim arising on an Indian reservation would violate the
Equal Protection Clause of the Fourteenth Amendment and
deny petitioner equal access to the courts, in violation of the
North Dakota Constitution.[6]  The court relied on *Washing-
ton* v. *Yakima Indian Nation*, 439 U. S. 463 (1979), in which
this Court rejected an equal protection challenge to a state
jurisdictional statute that relied on tribal classifications.  In
*Yakima Indian Nation* the Court held that the unique legal
status of Indian tribes under federal law permitted the Fed-
eral Government to single out tribal Indians in ways that
otherwise might be unconstitutional, and that the state juris-
dictional statute at issue there was insulated from strict
scrutiny under the Equal Protection Clause because it was
enacted under the authority of Pub. L. 280.  439 U. S., at
499–502.  The North Dakota Supreme Court concluded:
"Likewise, the people of North Dakota and the legislature
were acting under explicit authority granted by Congress in
the exercise of its federal power over Indians when our Con-

---

[6] "All courts shall be open, and every man for any injury done him in his
lands, goods, person or reputation shall have remedy by due process of
law, and right and justice administered without sale, denial or delay."
N. D. Const., Art. I, § 9.  The State's Constitution further provides that
no citizen or class of citizens "shall . . . be granted privileges or immunities
which upon the same terms shall not be granted to all citizens."  Art. I,
§ 21.

stitution was amended and Chapter 27–19 . . . was enacted." 321 N. W. 2d, at 513. As a result, any discrimination against Indian litigants did not violate the State or Federal Constitutions. *Ibid.*

Because of the complexity and importance of the issue posed by the North Dakota Supreme Court's decision, we granted certiorari. 461 U. S. 904 (1983).

## II

Respondent does not dispute that petitioner's claim comes within the scope of the civil jurisdiction recognized by the North Dakota court in its *Vermillion* ruling in 1957. Respondent advances two arguments in support of the North Dakota Supreme Court's conclusion that state-court jurisdiction no longer extends so far. The first is that federal law precludes the state courts from asserting jurisdiction over petitioner's claim. The second is that, regardless of federal law, the North Dakota Supreme Court has held that the trial court lacked jurisdiction as a matter of state law. We address these arguments in turn.

## A

Although this Court has departed from the rigid demarcation of state and tribal authority laid down in 1832 in *Worcester* v. *Georgia*, 6 Pet. 515, the assertion of state authority over tribal reservations remains subject to "two independent but related barriers." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142 (1980). First, a particular exercise of state authority may be foreclosed because it would undermine "'the right of reservation Indians to make their own laws and be ruled by them.'" *Ibid.*, quoting *Williams* v. *Lee*, 358 U. S., at 220. Second, state authority may be pre-empted by incompatible federal law. *White Mountain*, 448 U. S., at 142. Accord, *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 334, and n. 16 (1983); *Ramah Navajo School Board, Inc.* v. *Bureau of Revenue*, 458 U. S. 832, 837–838 (1982); *McClanahan* v. *Arizona State Tax Comm'n*,

411 U. S. 164, 179 (1973). We do not believe that either of these barriers precludes North Dakota courts from entertaining a civil action by an Indian tribe against a non-Indian for a claim arising on an Indian reservation.

Despite respondent's arguments, we fail to see how the exercise of state-court jurisdiction in this case would interfere with the right of tribal Indians to govern themselves under their own laws. To be sure, the full breadth of state-court jurisdiction recognized in *Vermillion* cannot be squared with principles of tribal autonomy; to the extent that *Vermillion* permitted North Dakota state courts to exercise jurisdiction over claims by non-Indians against Indians or over claims between Indians, it intruded impermissibly on tribal self-governance. See *Fisher* v. *District Court*, 424 U. S. 382 (1976); *Williams* v. *Lee, supra.* This Court, however, repeatedly has approved the exercise of jurisdiction by state courts over claims by Indians against non-Indians, even when those claims arose in Indian country. See *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S., at 173 (dictum); *Poafpybitty* v. *Skelly Oil Co.*, 390 U. S. 365 (1968); *Williams* v. *Lee*, 358 U. S., at 219 (dictum); *United States* v. *Candelaria*, 271 U. S. 432, 444 (1926); *Felix* v. *Patrick*, 145 U. S. 317, 332 (1892); *Fellows* v. *Blacksmith*, 19 How. 366 (1857).[7] The interests implicated in such cases are very different from those present in *Williams* v. *Lee*, where a non-Indian sued an Indian in state court for debts incurred in Indian country, or in *Fisher* v. *District Court*, where this Court held that a tribal court had exclusive jurisdiction over an adoption proceeding in which all parties were tribal Indians residing on a reservation. As a general matter, tribal self-government is not impeded when a State allows an Indian to enter its courts

---

[7] A number of state courts have recognized the right of Indians to bring suits in state courts against non-Indians for claims arising in Indian country. See, *e. g., McCrea* v. *Busch*, 164 Mont. 442, 524 P. 2d 781 (1974); *Paiz* v. *Hughes*, 76 N. M. 562, 417 P. 2d 51 (1966); *Whiting* v. *Hoffine*, 294 N. W. 2d 921, 923–924 (S. D. 1980).

on equal terms with other persons to seek relief against a non-Indian concerning a claim arising in Indian country. The exercise of state jurisdiction is particularly compatible with tribal autonomy when, as here, the suit is brought by the tribe itself and the tribal court lacked jurisdiction over the claim at the time the suit was instituted.

Neither are we persuaded that the exercise of state jurisdiction here would be inconsistent with the federal and tribal interests reflected in North Dakota's Enabling Act or in Pub. L. 280. As for the disclaimer provisions of the Enabling Act, the presence or absence of specific jurisdictional disclaimers rarely has had controlling significance in this Court's past decisions about state jurisdiction over Indian affairs or activities on Indian lands. *Arizona* v. *San Carlos Apache Tribe*, 463 U. S. 545, 562 (1983); see F. Cohen, Handbook of Federal Indian Law 268 (1982 ed.).[8] In this case, the sparse legislative record suggests only that the Enabling Act's phrase "absolute [congressional] jurisdiction and control" was meant to foreclose state regulation and taxation of Indians and their lands, not that Indians were to be prohibited from entering state courts to pursue judicial remedies against non-Indians. See H. R. Rep. No. 1025, 50th Cong., 1st Sess., 8–9, 24 (1888). To the extent that the disclaimer language of the Enabling Act may be regarded as ambiguous, moreover, it is a settled principle of statutory construction that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, with doubtful expressions being resolved in favor of the Indians. See, *e. g.*, *Bryan* v. *Itasca County*, 426 U. S. 373, 392 (1976); *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918). It would be contrary to this principle to resolve any ambiguity in the

---

[8] In *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 71 (1962), this Court held that the phrase "absolute jurisdiction and control" was not intended to oust States completely from all authority concerning Indian lands. See, however, *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 176, n. 15 (1973).

language of the Enabling Act in favor of a construction under which North Dakota could not provide a judicial forum for an Indian to obtain relief against a non-Indian.

We also cannot subscribe to the view that Pub. L. 280 either required North Dakota to disclaim the basic jurisdiction recognized in *Vermillion* or authorized it to do so. This Court previously has recognized that Pub. L. 280 was intended to facilitate rather than to impede the transfer of jurisdictional authority to the States. *Washington* v. *Yakima Indian Nation,* 439 U. S., at 490; see also *Bryan* v. *Itasca County,* 426 U. S., at 383–390. Nothing in the language or legislative history of Pub. L. 280 indicates that it was meant to divest States of pre-existing and otherwise lawfully assumed jurisdiction.[9] Section 6 of the federal statute authorized a State whose enabling Act and constitution contained jurisdictional disclaimers "to remove any legal impediment to the *assumption* of civil and criminal jurisdiction" (emphasis added). 67 Stat. 590, codified, as amended, at 25 U. S. C. § 1324. Similarly, § 7 gave congressional consent to the assumption of jurisdiction by any other State "not having jurisdiction." 67 Stat. 590. By their terms, therefore, both § 6 and § 7 were designed to eliminate obstacles to the assumption of jurisdiction rather than to require pre-existing jurisdiction to be disclaimed. Although the Civil Rights Act of 1968 amended Pub. L. 280 by adding tribal consent requirements, those requirements were not made retroactive;[10] the 1968 amendments therefore did not displace jurisdiction pre-

---

[9] Although *Vermillion* was decided after the enactment of Pub. L. 280, the North Dakota Supreme Court made clear that it was confirming pre-existing jurisdiction rather than establishing a previously unavailable jurisdictional category. See *Vermillion* v. *Spotted Elk,* 85 N. W. 2d, at 435–436.

[10] See 25 U. S. C. §§ 1321(a), 1322(a), 1326; S. Rep. No. 721, 90th Cong., 1st Sess., 32 (1967) (additional views of Sen. Ervin); Goldberg, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians, 22 UCLA L. Rev. 535, 551 (1975).

viously assumed under Pub. L. 280, much less jurisdiction assumed prior to and apart from Pub. L. 280. Similarly, while Pub. L. 280 authorized States to assume partial rather than full civil jurisdiction, see *Washington* v. *Yakima Indian Nation*, 439 U. S., at 493–499, nothing in Pub. L. 280 purports to authorize States to disclaim pre-existing jurisdiction. Indeed, the Civil Rights Act of 1968 granted States the authority to retrocede jurisdiction acquired under Pub. L. 280 precisely because Pub. L. 280 itself did not authorize such jurisdictional disclaimers.[11]

In sum, then, no federal law or policy required the North Dakota courts to forgo the jurisdiction recognized in *Vermillion* in this case. If the North Dakota Supreme Court's jurisdictional ruling is to stand, it must be shown to rest on state rather than federal law.

## B

This Court concededly has no authority to revise the North Dakota Supreme Court's interpretation of state jurisdictional law. Only last Term, in *Arizona* v. *San Carlos Apache Tribe, supra,* we noted that "to the extent that a claimed bar to state jurisdiction . . . is premised on the respective State Constitutions, that is a question of state law over which the state courts have binding authority." 463 U. S., at 561. That principle is equally applicable, of course, with respect to jurisdictional bars grounded in state statutes. If the North Dakota Supreme Court's decision that the trial court lacked jurisdiction in this case rested solely on state law, the only remaining issue before this Court would be petitioner's argu-

---

[11] See 25 U. S. C. § 1323(a); 2 U. S. Dept. of Interior, Opinions of the Solicitor Relating to Indian Affairs, 1917–1974, pp. 1951–1952 (1979); see also Goldberg, *supra,* at 558–562. Although any assumption of jurisdiction pursuant to Pub. L. 280 must comply with that statute's procedural requirements, see *Kennerly* v. *District Court of Montana*, 400 U. S. 423 (1971), Pub. L. 280's requirements simply have no bearing on jurisdiction lawfully assumed prior to its enactment.

ment that the jurisdictional disclaimer here violates petitioner's federal constitutional rights.[12]

It is equally well established, however, that this Court retains a role when a state court's interpretation of state law has been influenced by an accompanying interpretation of federal law. In some instances, a state court may construe state law narrowly to avoid a perceived conflict with federal statutory or constitutional requirements. See, *e. g., United Air Lines, Inc.* v. *Mahin*, 410 U. S. 623, 630–632 (1973); *State Tax Comm'n* v. *Van Cott*, 306 U. S. 511, 513–515 (1939); *Red Cross Line* v. *Atlantic Fruit Co.*, 264 U. S. 109, 120 (1924); see also *San Diego Building Trades Council* v. *Garmon*, 353 U. S. 26 (1957). In others, in contrast, the state court may construe state law broadly in the belief that federal law poses no barrier to the exercise of state authority. See, *e. g., Standard Oil Co.* v. *Johnson*, 316 U. S. 481 (1942). In both categories of cases, this Court has reviewed the federal question on which the state-law determination appears to have been premised. If the state court has proceeded on an incorrect perception of federal law, it has been this Court's practice to vacate the judgment of the state court and remand the case so that the court may reconsider the state-law question free of misapprehensions about the scope of federal law.[13]

---

[12] The United States and the Turtle Mountain Band of Chippewa Indians, each of whom has filed a brief *amicus curiae* in support of petitioner, suggest that Chapter 27–19 may violate 42 U. S. C. § 1981 to the extent that it precludes petitioner from maintaining its action in state court. Section 1981 provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to sue . . . as is enjoyed by white citizens." Petitioner does not appear to have relied on § 1981 before the North Dakota Supreme Court, nor has it done so here. In light of our disposition of this case, we need not decide whether the § 1981 issue is properly before us or, if so, whether a violation of § 1981 has been made out. The Supreme Court of North Dakota is free, of course, to consider the applicability of § 1981 on remand if it deems the issue to be properly before it.

[13] See 28 U. S. C. § 2106. In *United Air Lines, Inc.* v. *Mahin*, for example, two justices of the Illinois Supreme Court had construed a state tax

Here, a careful reading of the North Dakota Supreme Court's opinion leaves us far from certain that the court's present interpretation of Chapter 27–19 does not rest on a misconception of federal law. In determining the role played by that court's understanding of federal law, we are guided by the jurisdictional principles that have come to govern our calculation of adequate and independent state grounds. In *Michigan* v. *Long,* 463 U. S. 1032 (1983), this Court ruled that "when . . . a state court decision fairly appears . . . to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Id.,* at 1040–1041. Although petitioner's constitutional challenge to the North Dakota Supreme Court's judgment means that we do not face a question of our own jurisdiction, see *Standard Oil Co.* v. *Johnson,* 316 U. S., at 482–483, we believe that the same general interpretive principles properly apply here. The North Dakota Supreme Court's opinion does state that the North Dakota Legislature "totally disclaimed jurisdiction over civil causes of action arising on an Indian reservation," but it adds that the legislature did so "pursuant to Public Law 280," "[u]nder the authority of Public Law 280," and "under explicit authority granted by Congress in the exercise of its federal power over Indians." 321 N. W. 2d, at 511, 513. There are at least two respects in which these references and other language in the court's opinion leave it far less than clear that the North Dakota

statute to avoid a perceived conflict with the dormant Commerce Clause. This Court held that the interpretation forgone by the Illinois Supreme Court would not have run afoul of the Commerce Clause, and therefore remanded the case "to avoid the risk of 'an affirmance of a decision which might have been decided differently if the court below had felt free, under our decisions, to do so.'" 410 U. S., at 632, quoting *Perkins* v. *Benguet Consolidated Mining Co.,* 342 U. S. 437, 443 (1952).

Supreme Court's interpretation of Chapter 27–19 was not influenced by its understanding of federal law.

First, the court's treatment of petitioner's constitutional claims strongly suggests that the court's underlying interpretation of Chapter 27–19 would have been different if the court had realized from the outset that federal law does not insulate the present jurisdictional disclaimer from state and federal constitutional scrutiny. While we express no view about the merits of petitioner's federal equal protection challenge, we note that the North Dakota Supreme Court rejected petitioner's state and federal constitutional claims not because it viewed them as otherwise meritless, but because "the people of North Dakota and the legislature were acting under explicit authority granted by Congress in the exercise of its federal power over Indians" in disclaiming state jurisdiction. 321 N. W. 2d, at 513. The court had proceeded on a similar assumption before; in *Gourneau* v. *Smith*, 207 N. W. 2d 256 (1973), for example, the court rejected an Indian plaintiff's jurisdictional claim based on the "open courts" provision of N. D. Const. Art. I, § 9, because the tribal consent requirements of the Civil Rights Act of 1968 were taken to foreclose jurisdiction:

> "The courts of the State of North Dakota are open to all persons. But . . . Federal law prohibits State courts from assuming jurisdiction of civil actions involving Indians which arise on an Indian reservation, until such time as the Indians of that reservation have consented to such jurisdiction. Thus the courts of the State of North Dakota are open to Indians, if they consent to the courts' jurisdiction as provided by law." 207 N. W. 2d, at 259.

The assumption that Pub. L. 280 and the Civil Rights Act of 1968 either authorized North Dakota to disclaim jurisdiction or affirmatively forbade the exercise of jurisdiction absent tribal consent is incorrect, for the reasons given above. That assumption, however, appears to have been the sole basis relied on by the North Dakota Supreme Court to avoid

holding the jurisdictional disclaimer unconstitutional as applied in this case. Because the North Dakota Supreme Court has adhered consistently to the policy of construing state statutes to avoid potential state and federal constitutional problems, see, *e. g., State* v. *Kottenbroch,* 319 N. W. 2d 465, 473 (1982); *Paluck* v. *Board of County Comm'rs,* 307 N. W. 2d 852, 856 (1981); *Grace Lutheran Church* v. *North Dakota Employment Security Bureau,* 294 N. W. 2d 767, 772 (1980); *North American Coal Corp.* v. *Huber,* 268 N. W. 2d 593, 596 (1978); *Tang* v. *Ping,* 209 N. W. 2d 624, 628 (1973), it is entirely possible that the court would have avoided any constitutional question by construing Chapter 27–19 not to disclaim jurisdiction here, and it is equally possible that the court will reconstrue Chapter 27–19 that way if it is given an opportunity to do so.

Second, the manner in which the court rejected the availability of "residuary jurisdiction" leaves open the possibility that, despite the court's references to state law, the court regarded federal law as an affirmative bar to the exercise of jurisdiction here. The court stated:

> "In essence, [petitioner] argues that North Dakota retained residuary jurisdiction over actions brought by Indians against non-Indians for civil wrongs committed on Indian lands. . . . That argument would be more convincing had the legislature of North Dakota not, pursuant to Public Law 280, totally disclaimed jurisdiction over civil causes of action arising on an Indian reservation. *In re Whiteshield,* 124 N. W. 2d 694 (N. D. 1963). In *Nelson* v. *Dubois,* 232 N. W. 2d 54 (N. D. 1975), . . . *we rejected the concept of 'residuary' jurisdiction. We adhere to that decision today."* 321 N. W. 2d, at 511 (emphasis added).

The court's reliance on *Nelson* v. *Dubois* is suggestive because *Dubois* itself turned aside an attempt to invoke state-court jurisdiction over Indian country on the ground that federal law barred the exercise of jurisdiction. Specifically,

the court held that it did not have "residuary jurisdiction" over a suit by non-Indians against Indians, even if the exercise of jurisdiction were assumed not to infringe on tribal self-governance under *Williams* v. *Lee,* because the tribal consent provisions of the Civil Rights Act of 1968 pre-empted any exercise of state jurisdiction except in accordance with the terms of that Act. 232 N. W. 2d, at 57–59. The court recognized that its holding deprived the plaintiffs of any forum for their suit, but added: "The solution to this most serious problem lies not with the State. Congress may amend its statutes; Indian tribes of this State may begin to assert their own jurisdiction. This State cannot exercise jurisdiction that it does not possess." *Id.,* at 59.[14]

As noted above, the Civil Rights Act of 1968 in no way bars the exercise of jurisdiction in this case. The court's reliance on *Nelson* v. *Dubois* to dismiss petitioner's jurisdictional

---

[14] The court has made even more clear in other cases its view that Pub. L. 280, as amended by the 1968 Civil Rights Act, is an affirmative constraint on state jurisdiction. For example, in *Schantz* v. *White Lightning,* 231 N. W. 2d 812, 815–816 (1975), the court stated:

"*[A]ny* change from the present [jurisdictional] case law would require action by the United States Congress. The appellants are asking this court to assume the duties and responsibilities which are vested solely in the United States Congress. The arguments presented should be addressed to that body.

.      .      .      .      .

"The Congress has set out the mandatory procedure to be followed by the Indian Tribes and the State before the States may assume jurisdiction. . . . The Sioux Indians, not having accepted State jurisdiction as permitted and provided for by the congressional mandate and Chapter 27–19, we conclude that the State did not have, nor did it acquire, jurisdiction" (emphasis added).

See *United States ex rel. Hall* v. *Hansen,* 303 N. W. 2d, at 350; *Nelson* v. *Dubois,* 232 N. W. 2d, at 61 (dissenting opinion); *Gourneau* v. *Smith,* 207 N. W. 2d, at 259; see also *Poitra* v. *Demarrias,* 502 F. 2d 23, 27 (CA8 1974), cert. denied, 421 U. S. 934 (1975); *American Indian Agricultural Credit Consortium, Inc.* v. *Fredericks,* 551 F. Supp. 1020, 1021–1022 (Colo. 1982).

claim suggests, however, that the court was proceeding on a contrary premise. In that event, it may well have adopted a restrictive interpretation of Chapter 27–19 to avoid a perceived conflict between state and federal jurisdictional mandates.[15] By the same token, *Nelson* v. *Dubois* itself suggests that the court might recognize some measure of "residuary jurisdiction" here but for the mistaken belief that a federal jurisdictional impediment exists. Because we cannot exclude this possibility with any degree of confidence, the prudent course is to give the North Dakota Supreme Court an opportunity to express its views on Chapter 27–19 and thereby "avoid the risk of 'an affirmance of a decision which might have been decided differently if the court below had felt free, under our decisions, to do so.'" *United Air Lines, Inc.* v. *Mahin*, 410 U. S., at 632, quoting *Perkins* v. *Benguet Consolidated Mining Co.*, 342 U. S. 437, 443 (1952).

Our conclusion that the North Dakota Supreme Court's state-law decision may well have rested on federal law is buttressed by prudential considerations. Were we not to give the North Dakota Supreme Court an opportunity to reconsider its conclusions with the proper understanding of federal law, we would be required to decide whether North Dakota has denied petitioner equal protection under the Fourteenth Amendment by excluding it from state courts in a circumstance in which a non-Indian would be allowed to maintain a suit. It is a fundamental rule of judicial restraint, however, that this Court will not reach constitutional questions in advance of the necessity of deciding them. See, *e. g.*, *Leroy*

---

[15] In at least one instance, the North Dakota Supreme Court took care not to extend its restrictive jurisdictional holdings to the situation in which an Indian plaintiff brought suit against a non-Indian defendant in state court. See *Schantz* v. *White Lightning*, 231 N. W. 2d, at 814, n. 1 (rejecting broad formulation of jurisdictional issue because it "would require the consideration of a question if an Indian could sue a non-Indian"). The court also once stated flatly that "Indians have the right to sue non-Indians in State courts." *Rolette County* v. *Eltobgi*, 221 N. W. 2d 645, 648 (1974). But see n. 5, *supra*.

v. *Great Western United Corp.*, 443 U. S. 173, 181 (1979); *Massachusetts* v. *Westcott*, 431 U. S. 322, 323 (1977); *Alexander* v. *Louisiana*, 405 U. S. 625, 633 (1972); *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (1936) (concurring opinion); see also *Whalen* v. *United States*, 445 U. S. 684, 702 (1980) (REHNQUIST, J., dissenting).   This Court has relied on that principle in similar circumstances to resolve doubts about the independence of state-law decisions in favor of an interpretation that avoids a constitutional question.   See, *e. g.*, *Black* v. *Cutter Laboratories*, 351 U. S. 292, 299 (1956).   The same prudential rule is properly employed in this case.   If the North Dakota Supreme Court reinterprets Chapter 27–19 to permit petitioner to maintain its claim in the state courts, or if it concludes that Chapter 27–19 violates the State's Constitution insofar as it bars jurisdiction in this case, neither that court nor this one will be required finally to reach petitioner's federal constitutional challenge.   Under these circumstances, our responsibility to avoid unnecessary constitutional adjudication demands that we resolve any uncertainty over the North Dakota Supreme Court's decision in favor of the possibility that it was influenced by a misunderstanding of federal law.[16]

---

[16] In addition, the practical cost of mistakenly concluding that federal law influenced the North Dakota Supreme Court's treatment of Chapter 27–19 is far outweighed by the cost of mistakenly reaching the opposite conclusion.   If the court's misunderstanding of Pub. L. 280 in fact did not contribute to its interpretation of state law, the court is free to reinstate its former judgment on remand.   See, *e. g.*, *United Air Lines, Inc.* v. *Mahin*, 54 Ill. 2d 431, 298 N. E. 2d 161 (1973).   In contrast, if the court's understanding of federal law did play a role in its interpretation of Chapter 27–19 but we were to proceed on a contrary assumption, we would be depriving petitioner of a judicial forum that the North Dakota Supreme Court would make available if only it were given another opportunity to address the issue.   When the cost of erring in one direction is so negligible and the cost of erring in the other is so great, we think that uncertainty about the federal basis for the state-law decision properly is resolved in favor of the conclusion that federal law played a material role.

## III

It is important to recognize what we have not decided in this case today. We have made no ruling that Chapter 27–19 has any meaning other than the one assigned to it by the North Dakota Supreme Court. Neither have we decided whether, assuming that the North Dakota Supreme Court adheres to its current interpretation of Chapter 27–19, application of the statute to petitioner will deny petitioner federal equal protection or violate any other federally protected right. Finally, we have intimated no view concerning the state trial court's jurisdiction over respondent's counterclaim should the North Dakota Supreme Court decide that the trial court does have jurisdiction over petitioner's claim. Instead, we merely vacate the North Dakota Supreme Court's judgment and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE STEVENS joins, dissenting.

The highest state court in North Dakota has made a decision on the scope of state-court jurisdiction, a decision based on a state statute passed following amendment of the State Constitution. The question is clearly one of state law, immune from our review except in so far as it might be pre-empted by federal law or in conflict with the United States Constitution. The Court today does not say that Chapter 27–19, as interpreted by the North Dakota Supreme Court, is pre-empted by federal law. Nor does the Court find that statute unconstitutional. Yet the Court vacates the judgment below because Pub. L. 280 neither "authorized" nor "required" any disclaimer of pre-existing state jurisdiction.

I do not disagree with the Court's essay on the purpose and effect of Pub. L. 280. But I fail to see its relevance to the state-law issues decided by the court below. Accordingly, I would affirm the judgment of the North Dakota court

because the only federal question actually before us—the constitutionality of North Dakota's refusal to exercise jurisdiction over a lawsuit brought by an Indian tribe—is insubstantial.

In Part II–A of its opinion, the Court argues that state-court jurisdiction over this case would have been proper, as a matter of both federal and North Dakota law, prior to the passage of Pub. L. 280 and that nothing in Pub. L. 280 should have changed that situation. In Part II–B, the Court parlays the eclipse of this "residual jurisdiction" into a reason for concluding that the North Dakota Supreme Court may have misunderstood Pub. L. 280 when it interpreted Chapter 27–19. The linchpin of the entire argument is the 1957 case of *Vermillion* v. *Spotted Elk*, 85 N. W. 2d 432, in which the North Dakota court took an expansive view of the scope of state-court jurisdiction over suits by and against Indians in Indian country. The Court today correctly states that the jurisdiction claimed in *Vermillion*—over all civil actions arising in Indian country, except those involving interests in Indian lands—would embrace this case. *Ante*, at 147. But the argument for residual jurisdiction which the Court constructs around *Vermillion* is wholly untenable for the simple reason that the expansive jurisdiction of *Vermillion* was discredited, two years after it was claimed, by our decision in *Williams* v. *Lee*, 358 U. S. 217 (1959).

Both the specific holding and the broad dictum of *Vermillion* were pre-empted by *Williams* v. *Lee*.[1] The North Dakota court exercised jurisdiction in *Vermillion* over a suit arising out of a car accident on an Indian reservation in which all the parties were reservation Indians. The principles of tribal autonomy recognized in *Williams* v. *Lee* clearly pre-

---

[1] In *Williams*, a non-Indian who operated a store on an Indian reservation in Arizona sued an Indian couple to collect goods sold to them on credit. We held that principles of tribal autonomy precluded the Arizona courts from entertaining the suit in the absence of an affirmative assumption of jurisdiction by the state legislature. 358 U. S., at 222.

clude such an intrusion into strictly tribal affairs without affirmative legislative action pursuant to Pub. L. 280. See *Fisher* v. *District Court*, 424 U. S. 382 (1976). And the expansive claim made in *Vermillion* to jurisdiction over all civil actions arising in Indian country, except those involving interests in Indian lands, cannot be squared with the requirement that such jurisdiction be assumed by legislative action pursuant to Pub. L. 280.

In short, at the time Chapter 27–19 was passed, four years after *Williams* v. *Lee, Vermillion* was not in any sense good law. The "lawfully assumed jurisdiction," *ante,* at 150, which the Court thinks must have survived both Pub. L. 280 and Chapter 27–19, was in fact unlawfully assumed and therefore invalid. The fact that Chapter 27–19 appears to expand state jurisdiction over Indian country rather than to contract it must be understood, not in light of *Vermillion,* but in light of the intervening, superseding decision of this Court in *Williams* v. *Lee.* The North Dakota Legislature was effectively starting from "square one" in asserting jurisdiction over civil actions in Indian country when it passed Chapter 27–19. Thus, since the assumption of jurisdiction in Chapter 27–19 was predicated on tribal consent, which has not been forthcoming, the North Dakota Supreme Court could naturally and properly conclude that there was no state-court jurisdiction in this case.[2]

The Court glosses over this obvious difficulty in its argument by simply recasting *Vermillion* to fit its needs.

> "To be sure the full breadth of state-court jurisdiction recognized in *Vermillion* cannot be squared with principles of tribal autonomy; to the extent that *Vermillion* permitted North Dakota state courts to exercise jurisdiction over claims by non-Indians against Indians or

---

[2] In *Washington* v. *Yakima Indian Nation,* 439 U. S. 463, 495 (1979), we held that "any option State can condition the assumption of full jurisdiction on the consent of an affected tribe" even though not required to do so by Pub. L. 280.

over claims between Indians, it intruded impermissibly on tribal self-governance. . . . This Court, however, repeatedly has approved the exercise of jurisdiction by state courts over claims by Indians against non-Indians, even when those claims arose in Indian country." *Ante*, at 148.

In accordance with its view of what the North Dakota courts could have done compatibly with federal law, the Court proceeds to treat *Vermillion* as if it had in fact only claimed jurisdiction over suits by Indians against non-Indians. Thus, the Court says that nothing in Pub. L. 280 "required North Dakota to disclaim the basic jurisdiction recognized in *Vermillion* or authorized it to do so," *ante*, at 150, and that "no federal law or policy required the North Dakota courts to forgo the jurisdiction recognized in *Vermillion* in this case," *ante*, at 151. The Court even refers to the jurisdiction of *Vermillion* as "otherwise lawfully assumed jurisdiction." *Ante*, at 150.

I must confess to being nonplussed by the Court's treatment of *Vermillion*. It seems strange, indeed, to suppose that *Vermillion* is in some sense good law—when neither its holding nor its reasoning is acceptable under federal law— merely because the opinion would be acceptable if it had been written altogether differently and reached an opposite result. The fact remains that it was not written differently and did not reach the opposite result.

The North Dakota court improperly tried to assert jurisdiction over *all* civil actions arising in Indian country, except those involving interests in Indian lands. That attempt having failed, there is no indication that North Dakota would have accepted the one-way jurisdiction sought by petitioner in this case, whereby Indians can sue non-Indians but not vice versa. And the fact that our cases would have *permitted* the assumption of such jurisdiction is simply beside the point. Nothing in the Enabling Act, the State Constitution,

or Pub. L. 280 compelled North Dakota to grant Indians the right to sue non-Indians in state court in situations where non-Indians could not sue Indians. And it is sheer speculation to suppose that the State would have done so.[3]

Without *Vermillion* the Court's argument in Part II–B simply crumbles. For without some sort of plausible "residual jurisdiction" that would cover this case, Pub. L. 280 constitutes an affirmative bar to the assumption of jurisdiction by the North Dakota court. Any jurisdiction over Indian country assumed by an option State following passage of Pub. L. 280 must be assumed in accordance with the requirements of Pub. L. 280. It must be assumed, that is, by affirmative legislative action; state courts are powerless to act

---

[3] The North Dakota court's subsequent treatment of *Vermillion* provides a strong indication that the court would never, as a matter of state law, have recognized the one-sided jurisdiction sought by petitioner and permitted by federal law. As noted, the jurisdiction claimed in *Vermillion* under state law was invalid under *Williams* v. *Lee* as pre-empted by federal law. That same jurisdiction was also disclaimed as a matter of state law by the passage of Chapter 27–19. See 321 N. W. 2d 510, 511 (N. D. 1982).

Chapter 27–19 provides that "jurisdiction of the state of North Dakota shall be extended over all civil causes of action which arise on an Indian reservation upon acceptance by Indian citizens in a manner provided by this chapter." N. D. Cent. Code § 27–19–01 (1974). A later provision excepts from this jurisdiction suits involving interests in Indian lands. § 27–19–08. Thus, the jurisdiction which North Dakota stands ready to accept under Chapter 27–19 is exactly coterminous with that claimed in *Vermillion*.

If *Vermillion* had been good law, Chapter 27–19 would have been entirely superfluous. Following the passage of Chapter 27–19, therefore, the North Dakota court could reasonably conclude that the legislature had disclaimed (*i. e.*, renounced any claim to) the jurisdiction wrongfully usurped in *Vermillion* except on consent of the affected tribes. And the fact that the court concluded that *all* the jurisdiction of *Vermillion* had been disclaimed indicates that, as a matter of state law, the court views the jurisdiction of *Vermillion* as an all-or-nothing, reciprocal proposition. Again, it is irrelevant that our cases would have *permitted* the State to assert one-sided, residual jurisdiction. The State was not obliged to accept the invitation.

on their own initiative.   As we stated in *Kennerly* v. *District Court of Montana*, 400 U. S. 423, 427 (1971):

> "[T]he requirement of affirmative legislative action [was not] an idle choice of words; the legislative history of the 1953 statute shows that the requirement was intended to assure that state jurisdiction would not be extended until the jurisdictions to be responsible for the portion of Indian country concerned manifested by political action their willingness and ability to discharge their new responsibilities."

North Dakota took affirmative legislative action in passing Chapter 27–19, but conditioned its assumption of jurisdiction on tribal consent.   Since that consent has not been forthcoming, North Dakota has not assumed any additional jurisdiction over Indian country under Pub. L. 280.   See *Washington* v. *Yakima Indian Nation*, 439 U. S. 463, 499 (1979). North Dakota courts therefore have no authority to unilaterally augment their jurisdiction by entertaining suits either by or against Indians in actions arising on Indian lands. *Fisher* v. *District Court*, 424 U. S., at 388–389; *Kennerly, supra*, at 427.[4]   Unless, therefore, such jurisdiction was "assumed prior to and apart from Pub. L. 280," *ante*, at 151, an assumption I find untenable for the reasons given, Pub. L. 280 precludes the exercise of jurisdiction in this case.[5]

---

[4] For this reason, the Court's reliance on *Nelson* v. *Dubois*, 232 N. W. 2d 54 (N. D. 1975), and *Schantz* v. *White Lightning*, 231 N. W. 2d 812 (N. D. 1975), see *ante*, at 155–156, and n. 14, for the proposition that the North Dakota Supreme Court may have misread federal law is misplaced.   In so far as North Dakota has not already assumed lawful jurisdiction over suits arising in Indian country, either prior to Pub. L. 280 or pursuant to the terms of that statute, federal law does act "as an affirmative bar to the exercise of jurisdiction here," *ante*, at 155.

[5] Obviously, if Pub. L. 280 would preclude a judicial assumption of jurisdiction in this case, then the North Dakota Supreme Court properly disposed of petitioner's equal protection argument with a simple citation to *Washington* v. *Yakima Indian Nation*, 439 U. S., at 500–501, in which we rejected a similar challenge to a Washington statute which conditioned

I might finally add that even if one did posit a truncated *Vermillion* as somehow providing the residual jurisdiction necessary to the Court's argument until eclipsed by the North Dakota Legislature, there is still no indication and the Court offers no good reason to believe that the North Dakota Supreme Court interpreted Chapter 27–19 under any misapprehensions about Pub. L. 280. The North Dakota court in fact shows a perfectly clear appreciation of both the purpose and effect of Pub. L. 280.

> "The purpose of Public Law 280 was to facilitate the transfer of jurisdictional responsibility to the states. *Washington* v. *Confederated Bands and Tribes*, 439 U. S. 463, 505 (1979). It permitted states to amend their constitutions or existing statutes to remove any legal impediments to the assumption of civil and criminal jurisdiction, and thereby to unilaterally assume jurisdiction over criminal and civil matters within the exterior boundaries of Indian reservations within the states taking such action." 321 N. W. 2d 510, 511 (1982).

This statement of the law is unexceptionable. Indeed, the Court's own statement of the purpose and effect of Pub. L. 280, see *ante*, at 150, reads like a paraphrase of the above passage.

The North Dakota court never even remotely implies that Pub. L. 280 "required" the State to eliminate any pre-existing, lawfully assumed jurisdiction. The focus is rather on the passage of Chapter 27–19 by the state legislature. See n. 3, *supra*. And as to whether the court may have mistakenly thought that Pub. L. 280 "authorized" such a disclaimer of jurisdiction by the State, I cannot see how that question is relevant at all. Either a disclaimer of pre-existing jurisdiction was forbidden by federal law or it was not. If not, and

state jurisdiction over Indian lands in some subject-matter areas on Indian consent. It would also follow that the lower court's handling of the equal protection claim does not, as the Court would have it, *ante*, at 154, reflect any misunderstanding of federal law.

the majority does not imply that it was, then there is no additional requirement that it be affirmatively sanctioned. A State is not obliged to play "Mother, may I" with the Federal Government before retroceding jurisdiction that, under our cases, could have been retained.

In my view, therefore, the only federal question presented in this case is whether North Dakota's failure to permit Indians to sue non-Indians in circumstances under which non-Indians could not sue Indians violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. After our decision in *Washington* v. *Yakima Indian Nation, supra,* that question is not a substantial one. See n. 5, *supra.* Access to the North Dakota courts is within the power of petitioner. The Tribe need merely consent to the full civil jurisdiction which North Dakota, pursuant to Pub. L. 280, stands ready to offer them. Petitioner wants to enjoy the full benefits of the state courts as plaintiff without ever running the risk of appearing as defendant. The Equal Protection Clause mandates no such result.

I respectfully dissent.